# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 C 2212 | DATE | October 8, 2002 |
| CASE TITLE | Bell Enterprises Venture, et al. v. Santanna Natural Gas Corp., et al. | | |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Plaintiffs' Motion for Summary Judgment on Count I, Individual Defendants' Motion for Summary Judgment on Count IV, Santanna's Motion for Partial Summary Judgment on Count I, Plaintiffs' Motion for Class Certification, Plaintiffs' Motion to Bar Santanna's Experts, Santanna's Motions to Strike Giachetti Affidavit and Paragraphs in Plaintiffs' L.R. 56.1 Statement

DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing [held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference [held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial [set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs [by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Pursuant to the Minute Order issued by the Court on September 30, 2002, for the attached reasons, the Court finds in favor of the Individual Defendants on the federal RICO claim (Count IV), and therefore dismisses Plaintiffs' state law claims in Counts I, II and III in accordance with 28 U.S.C. § 1367. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to this minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | OCT 09 2002 date docketed | |
| ✓ | Docketing to mail notices. | | | 1168 |
| ✓ | Mail AO 450 form. | | CV docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| JHC | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BELL ENTERPRISES VENTURE )
and HTP AMERICA, INC., )
          Plaintiffs, )
) NO. 01 C 2212
)
) JUDGE WILLIAM J. HIBBLER
)
SANTANNA NATURAL GAS CORP., )
T. WAYNE GATLIN and JESSE D. SMITH, )
          Defendants. )

## MEMORANDUM OPINION AND ORDER

This controversy centers around what Plaintiffs, two commercial natural gas users in Illinois, contend are fraudulent and misleading promotional materials disseminated by Defendants, an independent third-party supplier of natural gas and its officers, containing promises to provide natural gas for a fixed rate at substantial savings. Plaintiffs claim Defendants intentionally made those statements, orally, in writing and on the company website, in order to induce them and other commercial natural gas users in Illinois to sign fixed-rate contracts with Santanna, knowing all along that if the price of natural gas rose a much higher rate would be imposed upon Santanna customers. The Amended Complaint raises three state law claims, breach of contract, breach of fiduciary duty, and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, *et seq.*, in addition to a federal racketeering statute (RICO) claim, 18 U.S.C. § 1964. Currently pending before the Court are Plaintiffs' motion for class certification, the parties' cross-motions for summary judgment and other miscellaneous matters relating to the breach of contract claim, and the Individual Defendants' motion for summary judgment on the RICO claim.

The Court has carefully reviewed the parties' arguments and evidentiary submissions, and now concludes Plaintiffs have failed to present evidence supporting the inference that the Individual Defendants intended to defraud Santanna customers. As such, Plaintiffs cannot raise a genuine issue as to whether

they engaged in racketeering activity. Consequently, the Court grants judgment in favor of the Individual Defendants on the RICO claim. Having dismissed the only federal claim in this action, the Court declines to exercise discretionary jurisdiction under 28 U.S.C. § 1367, and thus dismisses without prejudice Plaintiffs' state law claims, and strikes all pending motions pertaining to those dismissed claims as moot.[1]

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the record shows "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). In analyzing a motion for summary judgment, the Court views all facts and inferences in the light most favorable to the non-moving party.[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Nevertheless, a genuine issue of material fact exists only where the dispute over facts might affect the outcome of the lawsuit and there is sufficient evidence to support a jury verdict for the nonmoving party. *Id.* at 248. The party opposing summary judgment must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial" in order to avert summary judgment. *Id.* at 250. Indeed, where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the

---

[1] The only motion the Court arguably should have ruled on before reaching the merits of Plaintiffs' RICO claim is the request for class certification. *See* Fed. R. Civ. P. 23(c)(1). To avoid any prejudice to Plaintiffs, then, the Court's analysis of the RICO claim will proceed under the assumption that it would in fact be appropriate to certify a class consisting of "Plaintiffs and all other customers of Santanna who contracted in writing to purchase natural gas from Santanna at a fixed rate through Nicor's Customer Select Program during 1999 and/or 2000." The Court believes it proper to limit the class definition to those Santanna customers who signed the written form contract, as opposed to those customers who entered into oral fixed-rate agreements, to ensure the typicality requirement of Fed. R. Civ. P. 23(a)(3) is satisfied. *See Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 597 n.17 (7th Cir. 1993) (noting claims based on oral rather than written communications may be inappropriate for class treatment unless the communications are shown to be standardized)..

[2] However, the Court must disregard factual contentions in the Local Rule 56.1 statement of material facts or response which are conclusory or unsupported by the record or admissible evidence. *See, e.g., Malec v. Sanford*, 191 F.R.D. 581 (N.D. Ill. 2000).

burden of proof at trial," there can be no genuine issue as to any material fact. *Celotex*, 477 U.S. at 322-23.

## II. STATEMENT OF FACTS[3]

Defendant Santanna is an energy marketer that buys and resells natural gas and electricity to commercial end-users. Santanna maintains its principal place of business in Austin, Texas and a sales office in Hinsdale, Illinois. Individual Defendant Gatlin is Santanna's president. In that capacity, Gatlin is responsible for general management of the company. Significant to this case, Gatlin's duties include occasional participation in the drafting, review and approval of Santanna's promotional literature. However, Santanna also had a designated group of individuals who were responsible for developing and reviewing company-approved promotional materials, and the company actively discouraged sales representatives from creating and disseminating their own materials. Although Gatlin primarily works in the Austin office, he has traveled to the Illinois sales office on various occasions. Individual Defendant Smith was Executive Vice President of Santanna until his termination in November 2000. Like Gatlin, Smith worked in the Austin office, but his duties consisted solely of cold-calling prospective customers, primarily in Illinois. If a potential customer agreed to follow-up contact from a Santanna sales representative then Smith would pass that information along to the Hinsdale office. Smith avers that he did not participate in the management of Santanna, or draft, approve of or oversee any of Santanna's promotional materials or campaigns.[4]

Beginning in January 1999, NICOR, a local gas distribution utility company, instituted its

---

[3]Because the only issue under consideration is whether the Individual Defendants are entitled to summary judgment on the RICO claim, the Court's discussion is limited to the facts and legal arguments pertinent to that determination. A more thorough analysis of the case can be found in the Court's prior decision addressing Defendants' motion to dismiss. *See Bell Enter. Venture, et al. v. Santanna Natural Gas Corp., et al.*, No. 01C2212, 2001 WL 1609417 (N.D. Ill. Dec. 12, 2001).

[4]In their Local Rule 56.1(B)(3)(A) response, Plaintiffs claim their investigation continues as to the veracity of Smith's statements. However, the Court notes Plaintiffs have not specifically requested, as Fed. R. Civ. P. 56(f) allows, that ruling on the pending summary judgment motion be postponed until they have had an opportunity to gather additional evidence concerning this issue.

Customer Select program, whereby commercial end-users in parts of Illinois serviced by NICOR could purchase natural gas from an independent third-party supplier and then have it delivered by NICOR through its pipelines. In connection with the program, Plaintiff Bell, a NICOR customer, received a list of companies, including Santanna, to choose from by March 1999 when the enrollment period would end. Bell's principal, Robert Giachetti, made contact with Gary Young, a Santanna sales representative in the Hinsdale office. On January 21, 1999, Young faxed to Giachetti a Santanna promotional letter touting potential savings of 20% over the gas rates charged by NICOR based on a flat rate price of $.285 per therm. Bell subsequently signed a Natural Gas Agreement dated February 8, 1999, to buy gas from Santanna beginning in May 1999 for the next three years at a fixed rate of $.285 per therm. A year later, Santanna sent Bell an Addendum to the Natural Gas Agreement, providing for consolidated billing for the natural gas and transportation charges,[5] and extending the term of the contract a fourth year. The initial rate of $.285 per therm for natural gas was not changed by the Addendum. On March 20, 2000, Bell signed the Addendum.

In early 2000, NICOR once again offered its Customer Select program, with the enrollment period ending in March 2000. As with Bell, NICOR sent Plaintiff HTP a list of companies, including Santanna, from which to choose a gas supplier. Jeff Noland, HTP's principal, contacted Santanna and spoke with Paul Kalas in the Hinsdale office. Kalas faxed to Noland a Santanna promotional letter touting potential savings of 15% over the gas rates charged by NICOR based on a flat rate price of $.295 per therm. HTP subsequently signed a Natural Gas Agreement dated March 7, 2000, to buy gas from Santanna beginning in May 2000 for the next three years at a fixed rate of $.295 per therm.

Santanna's form Natural Gas Agreements allowed Customer Select participants to cancel their contracts and return to NICOR upon 30 days notice, but Santanna to terminate for non-payment only.

---

[5]*See Bell Enter. Venture*, 2001 WL 1609417, at *1 ("Participants in the transportation gas program pay [NICOR] for delivering their gas, and [Santanna] for the gas supplied.").

Nevertheless, by letter dated June 14, 2000, and sent to all Santanna customers with fixed rate contracts, Gatlin explained "[t]he published daily Chicago gas prices have moved from a low of $.2860 per therm in early April 2000 to a high of $.4650 per therm in June of 2000," and consequently, Santanna had determined a condition of "force majeure" exists such that it could no longer supply gas at the contract rate. Therefore, Gatlin stated, Santanna had already readjusted the rate for May 2000 gas deliveries and would continue to do so in the future, "based on the published Natural Gas Intelligence index, Chicago City Gate, (Bid Week) for the pertinent month, plus $.034 per therm."[6] Both Bell and HTP protested Santanna's refusal to honor the contractual rate, but to no avail. Each eventually returned to NICOR for natural gas services.

Plaintiffs maintain the Individual Defendants never intended to honor their promises in Santanna's promotional materials of fixed rates for natural gas resulting in potential savings of 15 to 20%.[7] In support of this contention, Plaintiffs specifically point to the fact that during the first part of 1999, Gatlin, on behalf of Santanna, purchased only enough natural gas to supply the first year of the contract (from May 1999 to April 2000), even though three-year contracts were available in the marketplace at that time. Gatlin testified at his deposition that after examining the cost, he decided not to purchase a three-year

---

[6] To understand the full impact of the price change requires a comparison of the rate Santanna charged before and after June 2000. For instance, in March 2000 when Bell opted for single billing, Santanna charged a flat consolidated rate of $.4239 per therm. Three months later, Santanna increased that rate to $.5049 per therm. In July 2000, Santanna charged $.6379 per therm. By February 2001, the rate had skyrocketed to a whopping $1.2659 per therm. Likewise, HTP contracted to pay $.295 per therm beginning in May 2000, but the first bill in June reflected an increase to $.3460 per therm. As with Bell, by February 2001, Santanna was billing HTP an unbelievable $1.1270 per therm.

[7] Gatlin avers that he did not create the promotional material sent to Bell or HTP, or recall approving it. Plaintiffs claim, as they did when responding to Smith's assertion of noninvolvement in Santanna's marketing processes, their investigation continues as to the veracity of Gatlin's statements. *See* fn.4, *supra*. Regardless, the Court is considering the claims of not just the named Plaintiffs but also prospective class members who may have received or viewed on Santanna's website promotional literature created or approved by Gatlin.

contract.[8] As further evidence of Defendants' alleged fraudulent intent, Plaintiffs also cite Gatlin's failure to purchase natural gas for the 2000 Customer Select enrollees. Gatlin explained at his deposition that he intended to buy natural gas in early 2000, as he had done in 1999, but decided to wait because the pricing market at that time did not offer economically viable packages. He could not recall if natural gas prices on the wholesale market were higher than or lower than the rate of $.295 per therm HTP contracted for in March 2000. Gatlin also testified that the first natural gas for the 2000 program was not purchased until May or June, and sometime thereafter, he concluded, based in part on the New York Mercantile Stock Exchange (NYMEX) pricing projections for natural gas futures, that Santanna would face financial devastation if it honored the contract rates. Moreover, Gatlin avers in an affidavit, he could not predict how much natural gas Customer Select participants would use over a three-year period, or how many customers would sign up with Santanna during a given enrollment period.

### III. ANALYSIS

To establish liability for a civil RICO violation, Plaintiffs must show the Individual Defendants (1) conducted (2) an enterprise through (3) a pattern (4) of racketeering activity. *See Lachmund v. ADM Investor Serv., Inc.*, 191 F.3d 777, 783 (7th Cir. 1999); *Peterson v. H&R Block Tax Serv., Inc.*, 22 F. Supp. 2d 795, 802 (N.D. Ill. 1998). Although this Court previously ruled that Plaintiffs had alleged, albeit just barely, their RICO claim with enough specificity to survive a motion to dismiss, no determination was made on the merits of Plaintiffs' claim that the Individual Defendants concocted this scheme to defraud commercial natural gas users. *See Bell Enter. Venture*, 2001 WL 1609417, at *7-9; January 28, 2002 Minute Order (finding Plaintiffs' proposed amended complaint sufficiently alleged a RICO violation). Now after evaluating the record, the Court concludes Plaintiffs clearly cannot demonstrate the fourth element, racketeering activity, and thus their RICO claim fails as a matter of law.

---

[8]Gatlin could not recall the price per therm of either the one year contract he purchased, or the three-year contract he considered.

Plaintiffs claim the Individual Defendants engaged in "racketeering activity" by committing mail and wire fraud. *See* 18 U.S.C. § 1961(1)(B) (defining "racketeering activity" as any act indictable under 18 U.S.C. § 1341 (mail fraud) or 18 U.S.C. § 1343 (wire fraud)). Claims of mail and wire fraud require proof of (1) participation in a scheme to defraud; (2) intent to defraud; and (3) use of the mails or wire in furtherance of the fraudulent scheme. *United States v. Ross*, 77 F.3d 1525, 1542 (7th Cir. 1996); *Emery v. American Gen. Finance, Inc.*, 71 F.3d 1343, 1349 (7th Cir. 1995) (mail fraud claim under civil RICO). In other words, the statutes punish deliberate fraud, "where in order to get money or something else of monetizable value from someone you make a statement to him that you know to be misleading, expecting him to act upon it to your benefit and his detriment." *Emery*, 71 F.3d at 1346 (7th Cir. 1995). *See also* 18 U.S.C. § 1341; 18 U.S.C. § 1343. Consequently, to avoid summary judgment, Plaintiffs must "produce evidence from which a jury could reasonably conclude that [Defendants] engaged in a scheme to defraud customers." *Block*, 22 F. Supp. 2d at 802. *See also American Auto. Accessories, Inc. v. Fishman*, 175 F.3d 534, 543 (7th Cir. 1999) (affirming grant of summary judgment on a civil RICO claim where there was no evidence defendant acted with intent to defraud plaintiffs).

Plaintiffs contend the record establishes that Defendants "knew and/or recklessly disregarded the fact that Santanna would be unable to or quite unlikely to honor the fixed rate contracts it entered into at the very time that Santanna was entering into such contracts and Defendants were making their false representations to Plaintiffs and members of the class." Pl.'s Mem. of Law in Opp'n to the Individual Defs.' Mot. for Summ. J. as to the RICO Count of the Am. Class Action Compl., p. 4. However, a series of broken promises do not constitute a pattern of fraud, unless the evidence shows "outright lies and a plan not to keep one's promises." *Perlman v. Zell*, 185 F.3d 850, 853 (7th Cir. 1999) (civil RICO). Otherwise, "there is a risk of turning every breach of contract suit into a fraud suit." *Desnick v. American Broad. Cos., Inc.*, 44 F.3d 1345, 1354 (7th Cir. 1995). Thus the mere fact that Defendants did not honor their promise to supply natural gas at fixed rates for the term of the contract, does not, standing alone, establish that they

never intended at the time they made the representations to perform the promise. *See Cohabaco Cigar Co. v. United States Tobacco Co.*, No. 98C1580, 1999 WL 988805, at *12 (N.D. Ill. Oct. 22, 1999) (finding it irrelevant to plaintiff's fraud claim that defendant did not fulfill its alleged promises); *Francis v. Bankcard Am., Inc.*, No. 93C5510, 1999 WL 1289110, at *8 (N.D. Ill. Jan. 4, 1999) (refusing to infer pre-existing fraudulent intent simply because defendant ultimately did not deliver on its promise). Rather, Plaintiffs must point to "specific, objective manifestations of fraudulent intent." *Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992)

In arguing that this Court should infer fraudulent intent, Plaintiffs rely on two particular facts, namely Gatlin's purchasing decisions on behalf of Santanna for Customer Select participants in 1999 and 2000.[9] First, Plaintiffs contend that even though Santanna was entering into hundreds of three year fixed-rate contracts during the January to March 1999 enrollment period, Gatlin intentionally did not purchase enough natural gas to supply the entire contractual term. Instead, Gatlin bought only enough to last the first year from May 1999 to April 2000. Gatlin admits the market offered three year contracts at that time, but he bypassed that option because of the price. However, this evidence does not demonstrate, as Plaintiffs argue, any intent to defraud Santanna customers. All it shows is Gatlin made a business decision that it would not be profitable to lock Santanna into paying the price then demanded by the market for a three year supply of natural gas. Indeed, the Court finds Gatlin's cautious approach reasonable under the circumstances.

True, customers contracted to purchase natural gas from Santanna for three years, but they could cancel at any time simply by giving thirty days' notice. Furthermore, given the limited three month enrollment period for entering the Customer Select program, there was no guarantee that if a Santanna customer returned to NICOR, the lost business could be quickly replaced. Thus it was not particularly

---

[9]Plaintiffs have presented no evidence that Smith played any role in that decisionmaking process.

easy to predict for one year, let alone three years, how many customers Santanna would be serving, or how much natural gas they would consume.[10] The Court recognizes that Santanna marketed itself to potential customers as having "the experience of energy professionals who provide the personalized expertise needed to manage your energy requirements for today." (See Compl., Ex. D (excerpts from Santanna's website)). As such, Gatlin arguably displayed poor business judgment in failing to ensure Santanna entered into contracts for natural gas that would allow it to fulfill the needs of the commercial users it had in turn promised to supply gas to for a three year period of time. But there is no hint of fraudulent intent in the 1999 decision to buy gas for one year as opposed to three years.

Similarly, Plaintiffs argue that during the Customer Select enrollment period in 2000, Santanna continued to sign up new customers for three years at a rate of $.295 per therm, when they knew the market price of natural gas at that time exceeded the contract rate and thus it would be economically unviable to fulfill the contract terms. In fact, Plaintiffs point out, Gatlin did not purchase natural gas for the new or existing Santanna customers until May or June 2000, and by then the price had risen so dramatically that Santanna declared a "force majeure" and refused to honor the contract rate. That evidence shows, Plaintiffs contend, Gatlin deliberately and/or recklessly engaged in fraudulent activity. The Court disagrees.

Plaintiffs maintain Gatlin should have anticipated Santanna would be unable to supply natural gas at the contract rate because in December 1996, natural gas prices had spiked to $.460 per therm, a figure only slighter lower than the $.4555 per therm natural gas traded at in May 2000.[11] Aside from the obvious

---

[10]Gatlin's deposition testimony suggests that the contract price Santanna paid to its supplier of natural gas was determined by the number of transactions or purchases made by Santanna. (Dep. of T. Wayne Gatlin, p.108). Thus, the anticipated volume of natural gas its customers would need was a factor Santanna had to consider prior to contracting for delivery of the gas.

[11]The Court finds it interesting that in connection with the cross-motions for summary judgment on the breach of contract claim, Plaintiffs moved to strike the report of Santanna's expert, Luis M. Guzman, on pricing in the natural gas industry, but now ask the Court to consider the same

-9-

fact that it would be patently unreasonable to hold Defendants responsible for not predicting the sudden escalation of natural gas prices in 2000, when the last such increase occurred almost four years prior to the relevant time period in this case, the Court is concerned with what Defendants actually *knew* about pricing in the natural gas market when participants in the 2000 Customer Select program were promised fixed rates. According to Guzman, on March 20, 2000 (at the very end of the enrollment period), natural gas traded at $.2714 per therm, which is in fact lower than HTP's contract rate. Thus the evidence Plaintiffs rely on here actually undercuts their argument that Santanna was promising to supply natural gas to customers at a rate much lower than the market could support. Looking back in hindsight, it is clear Santanna would have been in a much better position had Gatlin chose to enter into natural gas contracts in March 2000, prior to the precipitous increases that began two short months later. However, nothing in this record suggests Gatlin deliberately waited until May or June 2000 to purchase natural gas, because he knew contract prices would be higher, with the intent of imposing the excess charge upon Santanna customers.

Indeed, contrary to Plaintiffs' beliefs, this is not a case involving "the classic bait-and-switch" scheme where they were "lured with the promise of low prices and a fixed rate for three years" but Defendants "reneg[ed] on their fixed-rate promises and charg[ed] whatever prices they unilaterally deemed profitable." (Pls. Mem. of Law in Opp'n, p.2). *See e.g., Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1045 (7th Cir. 1998) (defendants made certain promises to induce plaintiff to place his mother in their nursing home and then reneged on those promises); *Chen v. Mayflower Transit, Inc.*, 159 F. Supp. 2d 1103, 1110 (N.D. Ill. 2001) (defendants guaranteed cost of move would not exceed estimate and plaintiff could pay with a credit card but then refused to release plaintiff's property unless she paid the additional amount in cash). Rather, the record reflects that what occurred here is Defendants decided *after* the contracts had

---

information in support of their RICO claim.

been entered into that it was not profitable to fulfill those terms and consequently reneged. Clearly, Plaintiffs have alleged and offered support for a breach of contract claim against Santanna. However, they have not produced any evidence whatsoever from which a jury could reasonably find that the Individual Defendants intended to defraud Santanna customers. Without fraudulent intent, Plaintiffs' mail and wire fraud claims fail, which, in turn, means they cannot establish racketeering activity to sustain a civil RICO claim.

The Court certainly understands Plaintiffs' frustration. After all, they signed fixed rate contracts in which Santanna promised to supply them with natural gas for three years at a set rate. And Santanna's form contract is silent concerning the events, if any, that might alter the company's obligation to fulfill its duties under the contract. In other words, Santanna made a written deal with each of its customers that regardless of market conditions, it would uphold its end of the bargain. Unfortunately, when Santanna did not (or as it says could not) deliver on the promise made, Plaintiffs were forced to pay much higher rates than the contract specified in order to obtain natural gas. Defendants' unilateral decision in June 2000 to switch the contract pricing structure from a fixed rate to a variable rate tied to an index was undoubtedly unfair. Nevertheless, because Plaintiffs have not presented sufficient evidence of a scheme to defraud, this Court cannot find Defendants' conduct was also fraudulent.

## IV. CONCLUSION

For all the foregoing reasons, the Individual Defendants' motion for summary judgment on the RICO claim (Count IV) is granted. Plaintiffs must seek further relief in state court.

**IT IS SO ORDERED.**

WILLIAM J. HIBBLER, DISTRICT JUDGE

**DATED:** October 8, 2002